**RECORD NO. 13-7(L)**
**CONSOLIDATED W/ NO. 16-2**

## IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

ANTHONY BERNARD JUNIPER,

*Petitioner - Appellant,*

v.

DAVID W. ZOOK,
Warden, Sussex I State Prison,

*Respondent - Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND

## OPENING BRIEF OF APPELLANT

Robert E. Lee, Jr.
Dawn M. Davison
VIRGINIA CAPITAL REPRESENTATION
RESOURCE CENTER
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
(434) 817-2970
roblee@vcrrc.org
ddavison@vcrrc.org

*Counsel for Petitioner-Appellant*
*Anthony Bernard Juniper*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................................i

TABLE OF AUTHORITIES ......................................................................ii

JURISDICTIONAL STATEMENT ............................................................1

STATEMENT OF ISSUES ........................................................................2

STATEMENT OF FACTS ..........................................................................2

SUMMARY OF ARGUMENT ....................................................................6

STANDARDS OF REVIEW ......................................................................7

ARGUMENT ...............................................................................................8

    I.    Juniper was prejudiced by the prosecution's suppression of evidence that an eyewitness saw the victim alive and being threatened by another man an hour after prosecutors alleged she had been murdered by Juniper ...................................8

    II.    The district court erred when it found Juniper had procedurally defaulted his meritorious ineffective assistance of appellate counsel claim .......................................20

CONCLUSION ...........................................................................................31

REQUEST FOR ORAL ARGUMENT ....................................................32

# TABLE OF AUTHORITIES

## Federal Cases

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) .........................................21

*Bowen v. Maynard*, 799 F.2d 593 (10th Cir. 1986) ...........................18, 19

*Brady v. Maryland*, 373 U.S. 83 (1963) ...................................................2

*Chadwick v. Janecka*, 312 F.3d 597 (3d. Cir. 2002) ..............................29

*Conaway v. Polk*, 453 F.3d 567 (4th Cir. 2006) .......................................7

*Darks v. Mullin*, 327 F.3d 1001 (10th Cir. 2003) ..................................29

*Guzman v. Sec'y Dep't of Corr.*, 663 F.3d 1336
   (11th Cir. 2011) ...................................................................................19

*Johnson v. Williams*, 133 S. Ct. 1088 (2013) ...........................................7

*Jones v. Sussex I State Prison*, 591 F.3d 707 (4th Cir. 2010) ...............28

*Kyles v. Whitley*, 514 U.S. 419 (1995) ....................................11, 14, 16, 18

*Mallory v. Smith*, 27 F.3d 991 (4th Cir. 1994) ..................................27, 28

*Martinez v. Ryan*, 566 U.S. 1 (2012) ........................................................1

*Monroe v. Angelone*, 323 F.3d 286 (4th Cir. 2003) ................................19

*Pethtel v. Ballard*, 617 F.3d 299 (4th Cir. 2010) ...................................26

*Picard v. Connor*, 404 U.S. 270 (1971) ...................................................26

*Ramdass v. Angelone*, 187 F.3d 396 (4th Cir. 1999) ........................26, 28

*Ring v. Arizona*, 536 U.S. 584 (2002) ...............................................*passim*

*Strickland v. Washington*, 466 U.S. 668 (1984) ......................................21

*Strickler v. Greene*, 527 U.S. 263 (1999) ................................................5

*Tice v. Johnson*, 2009 U.S. Dist. LEXIS 83931
   (E.D. Va. Sept. 14, 2009) ......................................................3

*Weeks v. Angelone*, 176 F.3d 249 (4th Cir. 1999) ...................................29

*Wiggins v. Smith*, 539 U.S. 510 (2003) ...................................................7

*Williams v. Brown*, 2016 U.S. Dist. LEXIS 132273
   (E.D. Va. Sept. 26, 2016) ......................................................3

## Federal Statutes

28 U.S.C. § 1291 .......................................................................1

28 U.S.C. § 2241 .......................................................................1

28 U.S.C. § 2253 .......................................................................1

28 U.S.C. § 2254 .......................................................................1

## Federal Rules

Fed. R. App. P. 4 .....................................................................1

Fed. R. Civ. P. 12 ...................................................................15

Fed. R. Civ. P. 59 .....................................................................1

## Federal Constitution

U.S. Const. amend. VI ..............................................................25

U.S. Const. amend. VIII ...........................................................25

U.S. Const. amend. XIV ...........................................................25

**State Cases**

*Atkins v. Commonwealth,* 510 S.E.2d 445 (Va. 1999) ...............23, 25, 30

*Morrisette v. Warden*, 613 S.E.2d 551 (Va. 2005) ...................................24

*Powell v. Commonwealth*, 552 S.E.2d 344 (Va. 2001) .....................23, 30

*Prieto v. Commonwealth*, 682 S.E.2d 910 (Va. 2009) ....................*passim*

**State Statutes**

Va. Code § 8.01-654.1 .............................................................4

Va. Code § 19.2-264.4 ..........................................................7, 22, 25, 30

**State Constitution**

Va. Const. art. I, § 8 ......................................................7, 22, 30

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Juniper's habeas petition and amended petition pursuant to 28 U.S.C. §§ 2241, 2254. This Court has jurisdiction over Juniper's appeal pursuant to 28 U.S.C. §§ 1291, 2253. After dismissing Juniper's petition, the district court's judgment became final when it denied Juniper's motion to alter or amend judgment pursuant to Fed. R. Civ. P. 59(e) on May 20, 2013. Juniper filed a notice of appeal on June 19, 2013. Fed. R. App. P. 4(a)(1).

This Court remanded the case to the district court for appointment of independent, qualified counsel to represent Petitioner on any defaulted claims that might be raised pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). Represented by new counsel, Juniper filed an amended petition on September 8, 2014. The district court dismissed that petition on August 3, 2015, and its judgment became final on February 2, 2016, when it denied Juniper's motion to alter or amend judgment pursuant to Fed. R. Civ. P. 59(e). Juniper filed his second notice of appeal on February 2, 2016. Fed. R. App. P. 4(a)(1).

## STATEMENT OF ISSUES

I.     Whether the district court correctly determined that Juniper's allegations in Claim I of the habeas petition failed to satisfy the materiality standard under *Brady v. Maryland*, 373 U.S. 83 (1963).

II.    Whether the district court improperly dismissed Juniper's claim that he was denied the effective assistance of counsel on appeal.

## STATEMENT OF FACTS

At approximately 2:20 p.m. on January 16, 2004, police responded to a 911 call and found the bodies of Keshia Stephens, her two youngest daughters, and her brother, Ruben Harrison III. All four victims had been shot to death. Stephens also had a non-fatal stab wound. Almost immediately, and with little regard for a growing mass of contrary evidence, police focused their investigation on Juniper. In their zeal to convict and execute Juniper, prosecutors violated Juniper's Constitutional rights pursuant to *Brady*, by suppressing material evidence which contradicted their theory of the case. The most powerful concealed information included evidence that Stephens was seen alive by an eyewitness an hour after prosecutors insisted Juniper had killed her.

Evidence of this misconduct came to light during the 2010 federal

prosecution of former Norfolk Police Investigator Robert Glenn Ford (the lead investigator in Juniper's case) for extorting money from drug defendants in exchange for falsely representing to judges and prosecutors that those defendants had helped investigate homicide cases—including this case. [1] The Government's exhibits included investigation notes from Juniper's case that had been concealed throughout Juniper's state court proceedings. App. 793–843. The notes included the identity of Wendy Roberts, an undisclosed eyewitness who spoke to police shortly after the murders. App. 800, 803.

State habeas counsel located Wendy and her son, Jason Roberts, who were Stephens's neighbors at the time of her murder.[2] Wendy and Jason revealed that they told police they heard what sounded like gunshots between 1:00 and 2:30 p.m., hours after the time prosecutors

---

[1] Ford's prosecution yielded multiple convictions and a 12-year sentence. Judgment, *United States v. Ford*, 2:10-cr-83 (E.D. Va. Feb. 28, 2011). Ford has a long history of malfeasance. He was the notorious lead investigator in the "Norfolk Four" cases which resulted in wrongful murder convictions for three young sailors. Their convictions have since been vacated, and the Commonwealth has declined to prosecute the men again. *See Tice v. Johnson*, 2009 U.S. Dist. LEXIS 83931 (E.D. Va. Sept. 14, 2009); *Williams v. Brown*, 2016 U.S. Dist. LEXIS 132273 (E.D. Va. Sept. 26, 2016).

[2] For clarity, this brief will refer to them as "Wendy" and "Jason."

claimed the shootings occurred. Immediately after hearing gunshots, they saw one man flee Stephens's apartment and drive away. Wendy recognized the man as someone who frequented the apartment, and she identified him for police in a photo lineup. App. 885–89.

Counsel obtained and filed affidavits from Wendy and Jason with the state court and requested that court order the production of statements Wendy and Jason made to police and the photo lineup.[3] App. 859–84. The Warden opposed the motion, and the state court denied it on the same day it denied Juniper's Petition for Rehearing. App. 890–95, 897.

Juniper next tried to exhaust this claim by filing a second state habeas petition and a motion requesting disclosure of exculpatory information. App. 898–976. After the Warden opposed Juniper's motion, App. 977–81, the state court dismissed the second petition and denied the motion. App. 982. The court, citing Virginia Code section 8.01-654.1, found the claim to be procedurally defaulted.

---

[3] This was not the first such motion Juniper had filed. It was the fifth. *See* App. 622–33; App. 660–76; App. 746–59; App. 769–92. The Warden opposed every request, arguing that Juniper had already been provided "everything required by law." *See* App. 682, 764; *see generally* App. 677–85, 760–68, 890–95. As it turns out, that wasn't true.

In federal habeas, Juniper was granted limited discovery. App. 1146–50. In addition to select pages from the investigation notes already made public at Ford's trial, the Warden produced the photo lineup and a one-page typed summary of notes from one of the investigators who had interviewed Wendy and Jason. App. 1161, 1164–65. The Warden also submitted affidavits from one prosecutor and one investigator. App. 1151–76.

Juniper submitted additional briefing in support of this *Brady* claim, relying on the new exculpatory information produced in discovery. App. 1177–93. The district court held that Juniper had established the first two prongs of *Brady*, App. 1227–31, but concluded that Juniper could not establish materiality and granted the Warden's motion to dismiss, App. 1231–36, 1282. The district court granted a certificate of appealability on whether Juniper had satisfied the *Brady* materiality standard. App. 1283.[4]

---

[4] The district court also found that Juniper had established cause to excuse the procedural default of this claim, App. 1231, but consonant with its materiality finding, found Juniper had failed to establish prejudice, App. 1235. Juniper's arguments in this brief that the concealed information is material also demonstrate that he has established prejudice. *See Strickler v. Greene*, 527 U.S. 263, 282 (1999).

## SUMMARY OF ARGUMENT

**(I)** After years of denying the existence of undisclosed *Brady* material, prosecutors were forced to turn over notes from an interview conducted with eyewitness Wendy Roberts, and the photo lineup she had been shown. Wendy told police that she had seen Stephens being threatened by a man in the parking lot more than an hour after prosecutors argued the victims had been murdered. App. 1161. When police showed Wendy a photo lineup that included Juniper, she selected another man. App. 1163–65.

The district court found the information was favorable and had been concealed, but concluded it was not material because of trial testimony placing Juniper at the scene of the crimes and circumstantial forensic evidence. App. 1227–36.

**(II)** Over counsel's objections, the trial court erroneously instructed jurors that they did not need to be unanimous in their finding of any one aggravating circumstance in order to sentence Juniper to death, as long as they were unanimous in their decision to impose a death sentence. In Virginia, however, a defendant convicted of capital murder does not become eligible for a death sentence until jurors

unanimously find that prosecutors have proven beyond a reasonable doubt one of two statutory aggravating circumstances. *See* Va. Code § 19.2-264.4(C); Va. Const. art. I, § 8; *Ring v. Arizona*, 536 U.S. 584, 589 (2002). Juniper's counsel failed to appeal the use of erroneous jury instructions and verdict forms. If counsel had appealed the issue, the state court would have vacated Juniper's death sentences.

Juniper presented this ineffective-assistance-of-*appellate*-counsel claim to the state court in his habeas petition, but that court failed to adjudicate it. Instead, the court adjudicated and dismissed an ineffective-assistance-of-*trial*-counsel claim that Juniper had not raised.

## STANDARDS OF REVIEW

This Court reviews de novo a district court's denial of habeas corpus relief. *Conaway v. Polk*, 453 F.3d 567, 581 (4th Cir. 2006). Nothing constrains a federal court's ability to grant relief on a claim presented to, but not adjudicated by, the state court. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013).

7

# ARGUMENT

## I. Juniper was prejudiced by the prosecution's suppression of evidence that an eyewitness saw the victim alive and being threatened by another man an hour after prosecutors alleged she had been murdered by Juniper.

The evidence against Juniper at trial rested primarily on the testimony of four witnesses: Renee Rashid, Keon Murray, Tyrone Mings, and a jailhouse snitch. Rashid, Murray, and Mings, placed Juniper at Stephens's apartment on the morning of the murders with a handgun. *Juniper v. Commonwealth*, 626 S.E.2d 383, 394–95 (Va. 2006). Murray and the snitch[5] testified that Juniper confessed to committing the murders. *Id.* at 395, 396. Prosecutors also presented forensic evidence, including a probable thumbprint of Juniper's on the blade of a kitchen knife that could have caused Stephens's wounds, and Juniper's DNA on a knife handle and a cigarette butt found at the scene. *Id.* at 395–96. The prosecution's evidence was that the victims were killed no later than approximately 11:44 a.m. *See* App. 618 (first 911 call received at 12:44 p.m.; caller stated she heard gunshot an hour

---

[5] Jailhouse snitch Ernest Smith has since recanted his testimony. App. 656–58.

8

earlier.);[6] *see also* App. 361. *Cf.* App. 1156, 1174–75.

In federal habeas proceedings, the district court ordered the Warden to turn over documentation of conversations between the police and Wendy or Jason and the photo lineup shown to Wendy. App. 1146–48. In response, the Warden submitted affidavits from prosecutor Philip G. Evans II and police investigator William A. Conway. Both men attached to their affidavits a one-page typed summary of Investigator Notes from Forgery Investigator D.I. Jones (the Jones Summary) and the photo lineup believed to have been shown to Wendy. App. 1151–76. The Jones Summary summarized notes from an interview Jones conducted with Wendy and Jason on the day of the murders.

According to the Jones Summary, Wendy told police she saw a man arguing with Stephens twice on the day she was murdered: Once around 9:30–10:00 a.m. and again around 12:30–12:45 p.m., when he threatened Stephens, saying "she had better not be there when he returned." App. 1161. Wendy told police the man "comes around . . . all

---

[6] Mings testified that he and his girlfriend, Melinda Bowser, made this call from their home on Kingston Avenue. App. 411, 415–18. There are many reasons to doubt his testimony. To begin with, the 911 records establish the call came from an address on E. Ocean Avenue. *See* App. 618, 1054–58.

hours of the day and night and beeps the horn for" Stephens. She also told the officers that the same man stopped by the apartment each morning around 7:30 to see Stephens's children. Wendy described the man as approximately 6'2" and weighing about 150 pounds. When Juniper surrendered to authorities, he was 6'1" and weighed 300 pounds. App. 18, 824–25, 1189.[7]

Conway stated in his affidavit that on the evening after the murders, he and Ford showed Wendy a "simultaneous six image photographic lineup." App. 1173–74. Although Juniper did not fit Wendy's description (at 300 pounds, Juniper weighed twice as much), his photograph was included in the lineup. App. 1164–65. Wendy did not select Juniper's photograph; she selected the man in the lower left corner. App. 1152–53, 1174.

The Jones Summary also reports Wendy heard "three or four bangs" at approximately 1:30 p.m. App. 1161.[8] According to the Jones

---

[7] According to the Jones Summary, Wendy also said she frequently saw another black male visit Stephens. She described him as a "very large fat guy" who drove an "older blue and white Ford 150." App. 1161. This man was probably Terence Fitzgerald. *See* App. 360 (Fitzgerald took Stephens's older girls to school and drove a truck.).

[8] Jason also heard bangs, but the Jones Summary does not include his time estimate. App. 1161.

Summary, Wendy thought the bangs sounded like firecrackers and Jason thought they sounded like hammering.

In short, the prosecution had in its possession information that an eyewitness saw Stephens arguing with a man who threatened her shortly before she was killed and at a time "when the prosecution's eyewitnesses all claimed [Juniper] had already fled the scene." App. 1228. That man did not fit Juniper's description and, when shown a photo lineup that included Juniper's photograph, the eyewitness selected another man. The same witness heard bangs at about 1:30 p.m., two hours after prosecutors maintained the victims had been killed. This information is material because it contradicts every supposed-eyewitness presented by prosecutors and casts suspicion on another man, thereby demonstrating the tunnel-vision displayed by the prosecution in its investigation of these murders. Evidence that the victim was seen being threatened by another man an hour after prosecutors claimed the defendant had killed her undoubtedly puts "the whole case in such a different light as to undermine confidence in the verdict," *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Juniper could end his argument here. The Jones Summary provides evidence that the victims were alive "at a time when the prosecution's eyewitnesses all claimed [Juniper] had already fled the scene," and calls into question the truthfulness of every prosecution eyewitness. App. 1228. If Wendy saw Stephens alive between 12:30 and 12:45 p.m., then

> such an observation would have impeached Tyrone Mings' testimony about going to the apartment, seeing [Juniper] with a gun after he committed the murders, and seeing [Juniper] gesturing to Stephens' dead body "between the bed and the dresser" of her bedroom. Likewise, it would have cast doubt on Renee Rashid's story about hearing gunshots go off as she drove away from the apartment earlier that morning, for Stephens would have still been alive several hours later. Finally, it would have made one question Keon Murray's story about receiving a call from [Juniper], during which the latter allegedly told Murray "[t]hey gone" and that he had "killed them."

*Id.* at 39–40.

Even before the Jones Summary came to light, the prosecution's eyewitnesses had credibility problems. Murray was threatened with criminal prosecution, App. 649; Murray and Rashid were given immunity in exchange for testimony, App. 19–20, 402–03; and Murray, Rashid, and Mings were all involved in illegal drug activities, App. 396–97, 409–10, 639, 642, 650, 654. At times they denied knowledge of the

murders. App. 419, 842–43. At other times they implicated Juniper. After the Jones Summary is revealed, one struggles to credit any portion of their accounts.

The district court, however, found that the forensic evidence foreclosed any possibility of a different result. The evidence—which the court below called "powerful"—was merely circumstantial. Juniper's thumbprint was found on the blade of a kitchen knife that could have been used to stab Stephens. His DNA was found on a handle that was likely formerly attached to that blade. His DNA was also found on a cigarette butt near the apartment entrance. But it is unsurprising that Juniper would leave biological evidence in an apartment that he frequented.

The district court failed to take into account the equally probative forensic evidence exculpating Juniper. His fingerprints were not found on key pieces of evidence in the apartment, such as the box of ammunition that contained the type of bullets used to kill the victims and the cartridges and cartridge casings. App. 376, 379–80. In fact, the prosecution identified a fingerprint of value on the cartridge tray that did not belong to Juniper. App. 376. Additionally, the prosecution's

expert testified that DNA on a cigarette butt recovered from the ashtray on the bed where the bodies of two victims were found did not come from Juniper and instead came "from an unknown individual." App. 385.

Certainly there was forensic evidence prosecutors could argue inculpated Juniper, but "the question is not whether the State would have had a case to go to the jury if it had disclosed favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Kyles*, 514 U.S. at 453. Jurors would not have been considering the forensic evidence in a vacuum. They would have been weighing it along with the testimony of disinterested eyewitnesses who had soundly discredited the prosecution's eyewitnesses.

When assessing materiality, the district court should have also considered the evidence that would have been discovered if the suppressed evidence had been disclosed. That evidence includes the information in the affidavits signed by Wendy and Jason in 2011. The district court did not consider these sworn statements when dismissing Juniper's *Brady* claim. Instead, the district court explicitly gave the prosecution the benefit of the doubt and only considered the

documentary evidence the Warden had been compelled to turn over in federal habeas proceedings. App. 1227–28. Presented with a motion to dismiss, the district court should have considered the evidence in the light most favorable to Juniper, the non-moving party. *See* Fed. R. Civ. P. 12(b)(6).[9]

In her affidavit, Wendy stated that while taking her service dog outside, she "heard a loud series of pops" and then saw only one man come out from the stairs leading to Stephens's apartment, get in a car parked in the gravel in front of Stephens's building, and drive off by himself. App. 885–86. Jason stated that after hearing gunshots, he looked outside. He also saw one man get into a car parked in front of

---

[9] The district court explained that "neither the Court nor any other disinterested party has any idea what the Roberts actually said to police back in 2004 because the police made no verifiable contemporaneous record of their statements, subject to [Wendy and Jason's] affirmation." App. 1227–28. If the court wanted evidence beyond their sworn statements about what Wendy and Jason had told police in 2004, it should have held a hearing, as Juniper requested. Instead, the district court considered only a portion of the evidence Juniper submitted in support of his *Brady* claim and subsequently concluded it was insufficient to meet the materiality standard. Juniper can and should prevail on materiality, even considering only the Jones Summary and photo lineup. If this Court disagrees, however, it should remand the matter to the district court for fuller development of the evidence that would have been uncovered in light of the Jones Summary and photo lineup.

Stephens's apartment and drive away. App. 888. They maintain they conveyed all this information to the police.

Their evidence was irreconcilable with the stories told by Rashid, Murray, and Mings who claimed that: (1) a female (Rashid) was in the car and driving, App. 387–89, 408, 416–17; (2) the car was parked in a parking lot across the street from the apartment building, App. 387–88, 400–05, 416; and (3) three men got in the car, App. 389, 406–07, 415–16. The Roberts's sworn statements so thoroughly contradict the testimony of Rashid, Murray, and Mings that the statements call into question whether the prosecution's eyewitnesses were even present for any of the events about which they testified, and raise suspicions about how their coordinated version of events was produced. In the absence of testimony from Wendy and Jason, the prosecutor was able to argue successfully that the consistencies in eyewitness testimony were hallmarks of credibility, App. 423–25, rather than indicia of coaching, App. 648–49. *See Kyles*, 514 U.S. at 444.

Sworn statements from Wendy and Jason also undermine the prosecution's evidence with regard to when the murders occurred. The prosecution's evidence is that the homicides took place at about 11:44

16

a.m., almost three hours before the massive police response to the scene and the discovery of the victims. *See* App. 618 (first 911 call received at 12:44 p.m., reporting a gunshot heard one hour earlier); 361 (Atkinson responded to a 911 call received at 12:45 p.m.); 620 (911 Event Chronology documents second call received at 2:12 p.m.); 362–72 (Snyder arrived at approximately 2:20 p.m., shortly thereafter discovered four victims, and then called for paramedics, notified Car Eight, his lieutenant, and dispatch.). In marked contrast to the prosecution's timeline, Wendy and Jason heard gunshots and saw one man flee Stephens's apartment about five minutes before many police officers arrived—meaning shortly before 2:20 p.m. App. 886, 888.

It was indispensable to the prosecution that the homicides occurred well before 12:45 p.m.—the time of the first 911 call—because that is when they had witnesses willing to say that Juniper was in the apartment. App. 392–93, 415–17 (Mings testified that Bowser placed the first 911 call *after* he saw Juniper, Murray, and Jones leave Stephens's apartment). Wendy and Jason refute this timeline and anchor the homicides to mere minutes before police responded to the second 911 call—at approximately 2:20 p.m. App. 886, 888.

17

Trial counsel would have been able to use Wendy and Jason in multiple ways to refute the prosecution's evidence and put the whole case in a different light. First, counsel would have been able to call Wendy, Jason, Kevin Waterman,[10] Chaunte Hodge, and Frazier as witnesses,[11] and present persuasive evidence that the murders did not occur when prosecutors alleged and that they occurred at a time when prosecutors' evidence did *not* put Juniper at the apartment. Second, counsel would have been able to impeach police officers with the shoddiness of their investigation including questioning them about their failure to investigate the assailant identified by Wendy. *See Kyles*, 514 U.S. at 446; *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A

---

[10] Waterman told police he heard four gunshots between 1:30 and 2:00 p.m. App. 634. Trial counsel were aware of this statement. They were unaware that Waterman's timeline was corroborated by two additional witnesses who not only heard gunshots around the same time, but then saw a man flee Stephens's apartment.

[11] Hodge lived in the apartment next to Stephens, and Frazier lived in the apartment directly below Stephens. App. 646. Both were questioned by police responding to the first 911 call, but neither testified at trial. *Id.* Hodge "told the police that everything had seemed normal when [she] came home at lunch time, and that [she] heard nothing unusual." *Id.* Frazier told police she had been in her apartment during the day, and "did not hear any unusual noises." *Id.* Despite Juniper's numerous requests, prosecutors have never been compelled to produce statements or summaries of interviews with Hodge and Frazier.

common trial tactic of defense lawyers is to discredit the caliber of the investigation . . . and we may consider such use in assessing a possible *Brady* violation."). Third—assuming prosecutors continued with their dubious strategy of relying on Rashid, Murray, and Mings—counsel would have been able to investigate, develop, and present evidence and argument that the false testimony of these witnesses was coordinated by the prosecution. *See Monroe v. Angelone*, 323 F.3d 286, 315 (4th Cir. 2003); *Guzman v. Sec'y Dep't of Corr.*, 663 F.3d 1336, 1352–53 (11th Cir. 2011). *Cf.* App. 1021–24. Counsel could have used the information in combination with other evidence to urge jurors to be skeptical of all the evidence developed in an investigation plagued by tunnel-vision.

If prosecutors had fulfilled their Constitutional duties and disclosed to the defense the Jones Summary and the photo lineup, then there is a reasonable likelihood that Juniper would not have been convicted or, at a minimum, would have been sentenced to life.

This Court should find that the Jones Summary and photo lineup were material evidence and, in their absence, Juniper did not receive a fair trial. The Court should vacate Juniper's convictions. If the Court, however, concludes that Juniper has not yet established materiality,

then it should remand the matter to the district court for fuller development of the evidence that would have been uncovered as a result of the timely disclosure of the Jones Summary and photo lineup.

## II. The district court erred when it found Juniper had procedurally defaulted his meritorious ineffective assistance of appellate counsel claim.

Juniper's trial counsel objected to the use of instructions and verdict forms telling jurors that unanimity as to a specific aggravating factor was not required. App. 494, 501–02. The court overruled counsel's objections, App. 494–95, 502, and even emphasized the erroneous instructions to jurors: "In fixing the punishment at death, there is no requirement that your verdict be unanimous as to which aggravating factor you rely on." App. 507; *see also* App. 513–57 (verdict forms). Further accentuating the erroneous instructions, the prosecutor argued:

> You don't have to agree on [an aggravating factor] . . . six of you could find vileness. . . . The other six of you could rely on future dangerousness. . . . Just as long as each one of you individually finds at least one aggravating factor. . . . It doesn't matter what the combination is as long as each of the twelve of you find at least one aggravating factor in the case[.]

App. 509–10. The prosecutor's hypothetical was the *exact* example that the state court highlighted in *Prieto v. Commonwealth*, as creating the

20

"troubling possibility" that a defendant would be sentenced to death in violation of the United States Constitution and Virginia law. 682 S.E.2d 910, 935 (Va. 2009). Despite counsel's preservation of the issue at trial, counsel failed to appeal the issue. Instead, counsel appealed an issue the court had not ruled on and therefore was not cognizable on appeal. *See* App. 613–16; *Juniper*, 626 S.E.2d at 400 (court refused to consider merits of appeal when record revealed counsel had not requested, and court had not given, a ruling on proposed instructions).

Counsel's failure to appeal the meritorious, preserved issue was objectively unreasonable under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668 (1984). If counsel had raised the claim on appeal, the state court would have reversed Juniper's death sentences.

The Sixth Amendment requires that jurors find beyond a reasonable doubt any fact that increases the maximum punishment for which a defendant is eligible. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). In capital cases, jurors must find beyond a reasonable doubt any fact without which a defendant could not be sentenced to death. *See Ring*, 536 U.S. at 589. Virginia's General Assembly has elected to

21

protect capital defendants from imposition of the death penalty unless jurors find that the prosecution has established beyond a reasonable doubt the presence of at least one statutory aggravating factor. *See* Va. Code § 19.2-264.4(C). And the Virginia Constitution requires jurors be unanimous in this decision. *See* Va. Const. art. I, § 8.

Juniper's jurors should have been instructed that he was not eligible for a death sentence unless they found unanimously and beyond a reasonable doubt the existence of at least one statutory aggravating factor. Instead the trial court specifically instructed jurors that they did not have to be unanimous in their selection of an aggravating factor. *See* App. 507, 513–57. Trial counsel preserved their objection to the instructions and verdict forms, but appellate counsel failed to appeal the obviously meritorious issue.

Counsel's failure is especially baffling because there was every indication that the state court would have reversed Juniper's death sentences. In the years leading up to Juniper's appeal, the state court had twice vacated death sentences when jurors were given verdict forms that were inaccurate or contradicted the jury instructions, even if the jury instructions themselves were indisputably correct. For example, in

22

*Atkins v. Commonwealth*, jurors were properly instructed that if prosecutors did not prove beyond a reasonable doubt the existence of at least one aggravating factor, then jurors must impose a life sentence. 510 S.E.2d 445, 452 (Va. 1999). The verdict forms, however, did not include an option for jurors to find prosecutors had failed to prove at least one aggravating factor beyond a reasonable doubt. *Id.* Jurors sentenced the defendant to death after unanimously finding that the prosecution had proven *both* aggravating factors beyond a reasonable doubt. *Id.* at 453. Nonetheless, the state court vacated the death sentence because jurors were given incomplete verdict forms that were in conflict with jury instructions. *Id.* at 457. *See also Powell v. Commonwealth*, 552 S.E.2d 344, 363 (Va. 2001) ("The rationale of *Atkins* flows from the principle that it is materially vital to the defendant in a criminal case that the jury have a proper verdict form." (internal quotation marks and citations omitted)). In Juniper's case, the verdict forms *and* the jury instructions were improper and in direct conflict with Virginia law and the federal Constitution.

Any lingering doubt about the likely success of Juniper's claim if it had been raised in 2006 is removed by the state court's decision three

years later in *Prieto*. Explicitly relying on the 2000 and 2002 decisions in *Apprendi* and *Ring*, respectively, the state court held that "the aggravating factors in Virginia's death penalty statute are facts that increase the maximum punishment for a defendant [and t]he death penalty may not be imposed unless the jury finds either or both of the aggravating factors . . . beyond a reasonable doubt." *Prieto*, 682 S.E.2d at 934–35; *id.* at 935–36 (finding verdict form was insufficient to require jurors unanimously to find beyond reasonable doubt one or both aggravating factors in order to impose death sentence).[12]

Counsel's failure to appeal the trial court's rulings on the instructions and verdict forms prevented the state court from addressing the merits of the claim on appeal. If counsel had appealed the instructions, controlling precedent from the United States Supreme Court and the state court would have mandated reversal of Juniper's

---

[12] In addition to the rulings in *Apprendi* and *Ring*, counsel also was on notice from a state court decision. Since gaining original jurisdiction over habeas petitions filed by death-sentenced inmates more than 20 years ago and after consideration of more than 60 such cases, the Supreme Court of Virginia has granted relief in only 3 cases, including *Morrisette v. Warden*, 613 S.E.2d 551 (Va. 2005). In *Morrisette*, decided four months before Juniper appealed, the Supreme Court of Virginia found counsel ineffective for failing to object to an improper verdict form. *Id.* at 563.

death sentences. There is more than a reasonable probability that, but for counsel's constitutionally deficient performance, Juniper's death sentences would have been overturned.

Although Juniper presented this claim to the state court, that court did not adjudicate the merits of Juniper's claim. Juniper argued to the state court in state habeas that, although trial counsel objected to the verdict forms and instructions, "the issue was not properly pursued on appeal to this Court. Had counsel done so, there is a reasonable probability that this Court would have reversed the sentence on direct appeal." App. 739–40 (providing multiple record citations and citing *Atkins v. Commonwealth*, 510 S.E.2d 445 (Va. 1999); Va. Code § 19.2-264.4; U.S. Const. amends. VI, VIII, XIV; and *Ring v. Arizona*, 536 U.S. 384 (2002)). The state court, however, addressed the claim as though Juniper had alleged ineffective assistance of counsel *at trial*, rather than on appeal, and found that Juniper had failed to satisfy *Strickland*. *See Juniper*, 707 S.E.2d at 309.

The district court erred when it found that Juniper's ineffective assistance of appellate counsel claim had not been fairly presented to the state court. In order to satisfy the requirements of exhaustion, the

25

state court must have a "fair opportunity" to address the claim. *Picard v. Connor*, 404 U.S. 270, 278 (1971). "A claim is fairly presented when the petitioner presented to the state courts the *substance* of his federal habeas corpus claim." *Ramdass v. Angelone*, 187 F.3d 396, 409 (4th Cir. 1999). The claim need not be identical to the one presented to the federal court, but must include the same "operative facts" and "controlling legal principles" as the claim presented to the federal court. *Pethel v. Ballard*, 617 F.3d 299, 306 (4th Cir. 2010). Juniper's habeas claim argued that counsel objected to the instructions and verdict forms before the trial court, but counsel unreasonably failed to appeal the preserved issue. Juniper maintained that, if counsel had appealed the issue, there was a reasonable probability that Juniper's death sentences would have been reversed.

The district court found that because the title of Juniper's state habeas claim referred to "trial counsel," instead of "appellate counsel,"[13] and because the claim was in a section addressing trial counsel's

---

[13] This was a typographical error from which the district court itself was not immune. In its opinion, the district court titled this section "*Trial Counsel* Did Not Receive Effective Assistance of Counsel on Appeal." App. 1279 (emphasis supplied).

performance, the claim about appellate counsel was not fairly presented to the state court. App. 1279–80.

The claim Juniper presented to the state court was one paragraph[14] and included the allegation that

> Trial counsel objected to the provision of forms #3 and #7 at trial . . . but the issue was not properly pursued on appeal. . . . Had counsel done so, there is a reasonable probability that [the state court] would have reversed the sentence on direct appeal.

App. 740. The claim makes no allegations about deficient performance on the part of trial counsel. In fact, the claim argues trial counsel properly objected to the verdict forms at trial, thus preserving the issue for appeal.

The district court found that the claim presented to the state court "lacked the requisite level of clarity" required under *Mallory v. Smith*, 27 F.3d 991 (4th Cir. 1994). App. 1280. In *Mallory*, this Court found that the petitioner had not exhausted his ineffective assistance of appellate counsel claim because he made no mention of appellate counsel in the three grounds for relief in his state habeas petition. 27

---

[14] Juniper's state habeas petition was limited to 50 pages. Juniper's motion to exceed the page limit was denied by the state court. App. 686. In order to comply with the page limit, Juniper's claims were necessarily concise.

F.3d at 993. All references to appeals and appellate counsel were made in the context of answering questions about procedural history or in a responsive pleading. *Id.* at 994–95.

In contrast, Juniper succinctly laid out supporting facts and the legal basis for his claim. This Court has held in similar circumstances that a petitioner satisfied the requirements of exhaustion. In *Ramdass*, this Court found that the petitioner had exhausted his due process claim that he was denied a mental health expert, even though the claim appeared in his petition below a heading that labeled it an ineffective-assistance-of-counsel claim. 187 F.3d at 409. *See also Jones v. Sussex I State Prison*, 591 F.3d 707, 711 (4th Cir. 2010) (petitioner exhausted double jeopardy claim when he cited state case addressing double jeopardy even though he did not expressly invoke double jeopardy clause in state court).

Juniper provided the state court with the factual basis for his claim, used clear *Strickland* language in reference to his appellate counsel's deficient performance and the prejudice resulting therefrom, and plainly invoked federal constitutional law. App. 739–40. Juniper's claim was fairly presented to the state court, and it is exhausted. To

find otherwise ignores the argument actually presented in the state court record.

Because application of § 2254(d) is expressly limited to claims that are "adjudicated on the merits in State court proceedings," that provision has no impact on this Court's consideration of Juniper's claim concerning appellate counsel. "When a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits . . . our review . . . is de novo." *Weeks v. Angelone*, 176 F.3d 249, 258 (4th Cir. 1999). *See also, e.g.*, *Chadwick v. Janecka*, 312 F.3d 597, 606 (3d. Cir. 2002) ("[I]f an examination of the opinions of the state courts shows that they misunderstood the nature of a properly exhausted claim and thus failed to adjudicate that claim on the merits, the deferential standards of review in AEDPA do not apply."); *Darks v. Mullin*, 327 F.3d 1001, 1012 (10th Cir. 2003).

The district court, however, disagreed. It found that although the state court did not address Juniper's ineffectiveness claim, it did consider the "underlying issue of whether the jury instructions and verdict forms were proper" and "found absolutely no defect." App. 1281.

Because of this, the district court reasoned, "there is no reason to believe that a direct appeal on the same issue . . . would have led to a different outcome." *Id*. The district court, like the state court, failed to recognize that this finding conflicted with Supreme Court law and the state court's own precedent applying that law.

The state court's conclusion that jurors were "properly instructed," is clearly rebutted by the record. *See* App. 504 ("If you find . . . either of the aggravating circumstances, then you may" sentence Juniper to death.), App. 507 ("[T]here is no requirement that your verdict be unanimous as to which aggravating factor you rely on."); *see also* App. 509. These are clear misstatements of Federal and state law. *See Ring*, 536 U.S. at 589; *Prieto*, 682 S.E.2d at 934–35 (holding Virginia statutory aggravating factors are facts that increase maximum punishment); Va. Code § 19.2-264.4(C); Va. Const. art. I, § 8. The state court's finding that the jury was properly instructed is insupportable.[15]

In reality, the state court's reasoning supports Juniper's claim. That court invoked the presumption that jurors follow their

---

[15] Even if the trial court *had* correctly instructed jurors, the instructions would have been inadequate to cure the erroneous verdict forms. *See Atkins*, 510 S.E.2d at 457; *Powell*, 552 S.E.2d at 363.

instructions. *Juniper*, 707 S.E.2d at 309. The trial court's instructions, however, plainly did not comport with the Sixth Amendment or Virginia law requiring that jurors be unanimous as to their eligibility phase finding that an aggravating factor was proven beyond a reasonable doubt. *See Ring*, 536 U.S. at 602; *Prieto*, 682 S.E.2d at 935. Any presumption that jurors followed their instructions is a presumption that jurors *failed* to follow the law and supports Juniper's claim for relief.

This matter is ripe for decision; it will not benefit from remand to the district court. This Court should grant Juniper the relief he has pursued for more than ten years—a sentencing phase where jurors are instructed in conformity with the Constitution before deciding his fate.

## CONCLUSION

For these reasons, Juniper requests this Court grant his petition.

## REQUEST FOR ORAL ARGUMENT

Because of the significance of the issues presented, Juniper requests oral argument.

Respectfully Submitted,

*/s/ Robert Lee*
Robert Edward Lee, Jr. (VSB No. 37410)
Dawn M. Davison (VSB No. 74811)
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, Virginia 22903
(434) 817-2970
(434) 817-2972 (facsimile)
roblee@vcrrc.org
ddavison@vcrrc.org

*Counsel for Petitioner-Appellant*
*Anthony Juniper*

## CERTIFICATE OF TYPE-VOLUME COMPLIANCE

The brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because the brief contains 6,461 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac 2011 in fourteen point Century Schoolbook.

/s/ Robert Lee
Robert Edward Lee, Jr. (VSB No. 37410)
Virginia Capital Representation
  Resource Center
2421 Ivy Road, Suite 301
Charlottesville, Virginia 22903
(434) 817-2970
(434) 817-2972 (facsimile)
roblee@vcrrc.org

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2017, the foregoing Appellant's Opening Brief was filed electronically through the Court's CM/ECF System, which will provide a copy of the materials to counsel of record in this matter.

*/s/ Robert Lee*
Robert Edward Lee, Jr. (VSB No. 27410)
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, Virginia 22903
(434) 817-2970
(434) 817-2972 (facsimile)